MUTUAL MARINE INSURANCE COMPANY *vs.* JOSIAH S. MUNRO. SAME *vs.* WILLIAM C. N. SWIFT & another.

Under a valued policy on the outfits of a whaling ship, " with liberty to touch at all ports or places for refreshments, and to sell her catchings, or ship them home at the risk of the assured," in which it is agreed that " one fourth of the catchings shall replace the outfits consumed, except that catchings shipped home from the Cape de Verd Islands or this side thereof shall be at the risk of the insured, without diminution of the value of outfits at the time," if less than three fourths of the catchings are discharged from the ship the other side of the Cape de Verd Islands and shipped home, neither the whole amount of the catchings sent home, nor any proportion thereof in the nature of salvage, is to be deducted from the amount of a subsequent total loss of the vessel and outfits.  And if the vessel is not lost, but arrives home in safety, the insurers are entitled to a *pro rata* premium on catchings so sent home.

THE *first* case was an action of contract to recover back money paid.  The parties submitted the case to the decision of the court upon the following facts :

In June 1848 the defendant procured from the plaintiffs a policy of insurance, for account of whom it might concern, loss, if any, payable to them, for $7,000 on ship Margaret and whaling outfits, (of which the defendant was a part-owner,) valued at $11,000 and $16,000, respectively, at and from Newport, at a premium of " seven per cent. if the risk ends within two years, four per cent. *per annum* for the third year or any part thereof, and five per cent. *per annum* for any longer time ; " " with liberty to touch at all ports or places for refresh-

ments, and to sell her catchings, or ship them home at the risk
of the assured, or to take freight when homeward bound." The
policy also contained the following clause : " It is understood
and agreed that one fourth of the catchings shall replace the
outfits consumed ; except that catchings shipped home from the
Cape de Verd Islands, or this side thereof, shall be at the risk
of the insured, without diminution of the value of outfits at the
time."

The ship sailed in June 1848 ; and in October 1849 was at
Honolulu, with whale oil on board, worth at home about
$46,000, and whalebone, worth about $11,000 at home. The
bone was there discharged from the Margaret by the master,
and shipped to the United States in another vessel, and ar-
rived in New York in June 1850, where it was sold by the
defendant, who paid to the other owners their proportions of the
proceeds. This shipment was not communicated to the plain-
tiffs, nor known to them.

After the shipping of the bone to New York, the ship, with
the entire catch of oil on board, continued her voyage, and in
February 1850 was lost at sea, by a peril insured against. A
total loss was claimed by the defendant, under the policy, and
was paid by the plaintiffs on the 2d of October 1850, amounting
to $6,569.06.

The plaintiffs claim their proportion of one fourth part of the
value of the bone sent home, under the clause in the policy, that
" One fourth part of the catchings shall replace the outfits con-
sumed." The defendant denies that he is liable to the plaintiffs
for any part of the same.

This case was argued at October term 1854.

*T. D. Eliot,* for the plaintiffs.

*S. Bartlett,* for the defendant.

BIGELOW, J.   This case raises an interesting and important
question, growing out of certain clauses which are now usually
inserted in policies of insurance issued in this commonwealth
upon the outfits of vessels engaged in the whale fishery. We
have not found it easy to solve the difficulties which seem to
surround any interpretation of which the controverted parts of

the contract are susceptible; but in arriving at a decision upon them, we have endeavored to carry out what appears to us to have been the real intent of the parties.

The plaintiffs, having paid the defendant for a total loss of the outfits of the ship Margaret on a valued policy issued by them, seek to recover in this action a proportion of one fourth of the value of certain whalebone, which, it is agreed, was discharged from the Margaret before her loss, and shipped to New York, where it was sold, and the proceeds paid over to the defendant, and by him to the other owners of the vessel and cargo. This claim is founded on the clause in the policy, which provides that " one fourth of the catchings shall replace the outfits consumed." It is presented in two aspects. The first is, that the whalebone shipped home and sold was withdrawn from the risk, during the performance of the stipulated voyage, by the assured, and that thereby the valuation of the outfits, and the liability of the plaintiffs under the policy, were, at the time of the loss, reduced, to the extent of their proportion of one fourth of the value of this shipment and sale. If this position is not tenable, then the plaintiffs contend that the whalebone sent home and sold constituted a part of the catchings, and one fourth part thereof was in the nature of salvage, realized by the assured, and a proper proportion thereof is to be deducted from the amount of the loss on outfits for which the plaintiffs were liable. If either of these positions is maintained, it being agreed that the plaintiffs paid to the defendant the full amount of the valuation of the outfits upon a total loss, in ignorance that any catchings had been shipped home and sold, then this action will lie to recover back the amount so overpaid to the defendant, as having been paid under a mistake of facts.

In answer to this claim, the defendant relies on another clause in the policy, by which it was agreed, that the assured should have " liberty to touch at all ports or places for refreshments, and to sell the catchings, or ship them home at the risk of the assured;" and contends that, under this stipulation, the catchings shipped home and sold became severed from the voyage,

and were at the sole risk of the owners ; that the insurers ceased to have any interest in them ; and that the valuation of outfits or substituted catchings, and the liability of the insurers to pay the full amount thereof in case of total loss, without any deduction or allowance, were wholly unaffected by such shipment and sale.

The whole controversy turns therefore on the true construction of this clause in the policy, by which the assured have liberty to sell or ship home their catchings during the progress of the voyage, taken in connection with the stipulation, that one fourth of the catchings shall replace outfits consumed.

There can be no doubt or dispute as to the purpose of this last provision. It is intended to prevent the reduction of the valuation of outfits, by their necessary consumption in the course of a long voyage, and their consequent withdrawal from the risk. By substituting therefor a certain proportion of the catchings, the whole interest covered by the policy is kept full, and the valuation remains undiminished during the entire voyage. *Macy* v. *Whaling Ins. Co.* 9 Met. 354. 1 Phil. Ins. § 497. This consideration has an important bearing on the question raised in this case. The policy was a valued one on the outfits, and it was intended by the parties that the valuation should be unchanged as long as the risk continued. By the well settled rule of law, under a valued policy on cargo, the assured may ship less than the agreed quantity, or divert a part of the original shipment from the stipulated voyage during its performance. In such case, the legal effect on the policy is to reduce the valuation *pro tanto*, and, in the event of loss, a recovery can be had only *pro rata*, in the proportion which the goods actually at risk bear to the whole valuation. *Wolcott* v. *Eagle Ins. Co.* 4 Pick. 429. *Alsop* v. *Commercial Ins. Co.* 1 Sumner, 451. *Rickman* v. *Carstairs*, 5 B. & Ad. 660. This rule has been so long and so well established, that it must be presumed, in the absence of any indication of the actual intent of the parties, that it was well understood by them, and that the contract was entered into with reference to it.

But this is not left to inference. In another part of the policy

it is expressly provided, that " catchings shipped home from the Cape de Verd Islands, or this side thereof, shall be at the risk of the insured, without diminution of the value of outfits at the time." From this it is manifest, not only that the effect of a sale or shipment of catchings substituted for outfits was known to the parties, but also that it was a matter of express stipulation between them, that in the early part of the voyage, when but a small part of the outfits would be consumed, it should not operate to reduce the valuation.   This leads to a very strong inference that it was the intent of the parties that sales or ship-ments made subsequently should fall within the operation of the rule, and go to the diminution of outfits or substituted catch-ings, if any portion of the latter was withdrawn from the risk. Otherwise, it would have been provided against in like manner in that clause of the policy, where liberty is given to the assured to touch at all ports or places for refreshments, and to sell the catchings or ship them home.

In this view, it would be impossible to adopt the construction urged upon us by the counsel for the plaintiffs, that the object of this last clause was to provide that the valuation should re-main unaffected by the exercise of the liberty to sell or ship the catchings home, even if a part of the substituted catchings should be withdrawn from the risk.   The fair inference from the whole contract is exactly the reverse.   The fallacy consists in assuming that this provision was inserted in the policy with any reference to the valuation, or for the purpose of conferring on the assured a liberty to sell or ship home his catchings.   That was a right which he had without any permission from the insurers.   Its exercise would not affect the validity of his policy, if it caused no delay or deviation in the voyage.   Its legal operation would be to reduce the valuation in the policy, if any part of the outfits or substituted catchings was withdrawn from the risk.   In this respect, no change was made or intended to be made in the rights or obligations of parties by this stipula-tion.   It was introduced for a wholly different purpose.   Indeed it is in terms not a mere liberty to sell or ship catchings, but it is to touch at ports or places for that purpose.   This then is its

meaning : Unless justified by usage, the assured, without such express liberty, would have no right to touch at any place in order to sell or transship his catchings.   By so doing, he would deviate from the prescribed voyage, and avoid the policy.   Nor could he, under a permission to stop for refreshments only, be allowed to stay to discharge any part of the cargo.   1 Phil. Ins. §§ 1004, 1016.   But under this clause he could do both, without being guilty of unnecessary or unlawful delay or deviation.   We cannot doubt therefore that this policy is a valued one on outfits, to which the ordinary rule of law is to be applied, and that a deduction is to be made from the valuation, in case of a withdrawal of a part of the subject insured from the risk during the voyage.

This brings us to the question, whether any such deduction ought to be made on the facts agreed in this case.   And this, we think, depends entirely on the effect which is given to that agreement in the policy, which provides that one fourth of the catchings shall replace outfits consumed, and on the nature and extent of the interest in the catchings, which is thereby given to the insurers.   To arrive at a correct conclusion on these points, it will be necessary to take into consideration the subject matter at risk, and the course of trade or business which the parties had in view on the voyage contemplated by this policy.   Although the same rules of construction are to be applied to all written contracts, yet in interpreting mercantile agreements, especially stipulations in policies of insurance, which are always briefly and often inartificially expressed, it is necessary more frequently to go out of the written instrument, in order to ascertain the true intent of the parties.   Nor can the more literal and obvious meaning of a clause be insisted on, when it contravenes the general purpose and scope of the contract.   1 Phil. Ins. §§ 124, 130. That was, as has been already stated, that the policy should be a valued one, without diminution, on the outfits throughout the voyage.   Without some special provision, the necessary consumption and use of the outfits would constantly diminish their value, withdraw them from the risk, and proportionally reduce the valuation.   To avoid that result, and to furnish a full indem-

nity to the assured, by keeping the outfits good at all times up to the valuation, was the object of the clause by which one fourth of the catchings was substituted for outfits.

It would seem to follow, that so long as this one fourth of the entire catchings of the voyage is retained on board the vessel, the subject matter covered by the policy, or the interest insured, is full. No part of it is withdrawn from the risk, and no deduction ought to be made from the valuation. This then is the measure of the interest which the insurer on outfits has in the catchings. If one fourth still remains on board, the stipulated equivalent for outfits consumed is subject to the risk. In the other three fourths the insurer on outfits has no interest. They belong to the owners, who must either incur the risk of their loss, or protect them by other policies. There is no agreement, express or implied, that these shall continue on board the vessel during the voyage, and their withdrawal from it in no way affects the rights of the insurer on the remaining one fourth substituted for outfits. This still remains at risk. It is only when the sales or shipments during the voyage exceed three fourths of the whole catchings, that any part of the subject insured is withdrawn, and there is a diminution of the subject matter at risk; and a corresponding reduction of the valuation is to be made, in proportion as the amount remaining on board falls short of one fourth.

It is not therefore a correct interpretation of the contract, that the insurer on outfits has such an interest in the catchings, that the withdrawal of any part of them, by the exercise of the right to sell or ship them during the voyage, reduces the interest covered by the policy, and diminishes the valuation of outfits *pro tanto;* so that, for instance, if one eighth of the catchings should be sold or shipped, leaving seven eighths on board, the valuation of outfits would be reduced one fourth of one eighth. Such a construction of the contract, though it might be the more literal and obvious interpretation of a particular clause in the policy, would defeat the main purpose of keeping the valuation on outfits full during the whole voyage. For it is clear, if this be the rule, that such sale or shipment of catchings would re-

duce the valuation of outfits to an amount equal to one fourth of the value of the catchings shipped or sold. In the course of long voyages, covering, as is often the case, a period of four or five years, vessels engaged in the whale fishery frequently put into port to replenish their outfits, and to sell or ship home a part of their catchings. During such a voyage, the value of the outfits is constantly fluctuating; at one time, they are greatly diminished; at another, they are restored nearly to their original value. Besides; if the voyage has been successful and the catchings large, the master may make several shipments or sales, the value of which may equal or greatly exceed the entire valuation of outfits in the policy. In such case, if the valuation of outfits were to be reduced by each shipment or sale of catchings, the result would be, that to the extent of one fourth of the value of all such shipments or sales there would be no insurance on outfits under the policy, whatever their actual value might be, or however long the voyage might be afterwards protracted. Nor is this all. In the event that this one fourth of the sales or shipments should equal the whole valuation of outfits, there would be no insurance under the policy on the outfits for the residue of the voyage.

In the case at bar, the catchings during the first sixteen months of the voyage amounted to fifty seven thousand dollars If one half of them had been shipped by the master at Hono lulu in October 1849, and one fourth of that half had been applied to the reduction of the valuation in the policy, it would have left the outfits, or substituted catchings, remaining on board during the residue of the voyage, protected by insurance to an amount less than one half their valuation in the policy. It is clear that a construction of the contract, which leads to such a result, is inconsistent with the plain intent of the parties. The great purpose of having a valued policy on outfits, and keeping the interest full during the entire voyage, by a substitution therefor of a certain portion of the catchings, would be thereby defeated.

This view is confirmed by a consideration of the usual course of trade pursued by vessels engaged in the whale fishery. It is

to be observed, that the liberty to touch for the purpose of selling or shipping catchings is part of the same clause by which permission is also given to touch at all ports or places for refreshments. It is well known, that large portions of such parts of the outfits as are perishable or consumed are frequently renewed at these intermediate ports, where vessels stop for refreshments, by purchases made with the proceeds of the catchings there sold, or by drafts drawn by the masters on their owners, to meet which a part of the catchings is shipped home. By this means the outfits are renewed, and for a time increased in value. It can hardly be supposed, in view of this well known course of trade, that it was the intention of the assured to reduce the valuation on his outfits, and diminish the amount of his insurance thereon, by the same means and at the very time he was actually adding to their value. And yet such would be the practical effect if each shipment or sale is to reduce outfits *pro tanto*.

It is true that this construction of the contract would defeat the purpose of keeping the valuation on outfits full during the voyage, in the single event that the sales or shipments should exceed three fourths of the catchings, so that less than one fourth should remain on board the vessel, subject to the risk. But if such a contingency should arise, it would be only the ordinary case of a reduction of valuation by a withdrawal of a portion of the subject matter insured. The assured, in case of loss, would then recover the amount covered by the policy, less the amount withdrawn from the risk. It certainly is not unreasonable to suppose that the parties framed their contract with reference to the well known and established rule of law applicable to such a diminution of the subject at risk as would reduce it below the one fourth intended to be protected by the policy.

It results from these considerations, that the construction of this contract which seems to be most reasonable, and best carries out the intent of the parties, is that the insurer on outfits has an interest only in one fourth of the catchings; that this constitutes the subject matter covered by the policy; that, so

.ong as one fourth of the entire catchings, in all stages of the voyage, is retained on board the vessel, the whole interest is kept full, and nothing is withdrawn from the risk which should go to the diminution of the valuation ; and that the other three fourths are at the risk of the owner, who can sever them from the voyage, and sell or ship them, without affecting his rights under the policy on outfits.   This construction of the policy is not open to the objection, which was very strongly urged by the counsel for the plaintiffs, that the assured might, after his outfits were exhausted near the close of a voyage, ship or sell the whole of his catchings, and, if the vessel should be subsequently lost, recover on his policy the full valuation of his outfits or substituted catchings.   No such contingency can arise ; because, to the extent to which he reduces catchings on board, by sales or shipments, below one fourth part of the whole, he diminishes his valuation, and the amount of his claim on the underwriters in case of loss.

There may be some practical difficulties in carrying out this construction of the policy.   There is no view of the case entirely free from them.   But upon the best consideration we are able to give to the subject, we are of opinion, for the reasons stated, that the plaintiffs are not entitled to recover, on the ground that the valuation was reduced by the shipment home of a part o the catchings.   At the time of the loss, a much greater amount than one fourth of all the catchings, both in quantity and value, remained on board.   No part of the subject insured was withdrawn from the risk.

The other ground on which the plaintiffs seek to recover cannot be supported.   It is not only irreconcileable with the construction already given to the contract, but it is inconsistent with the express terms of the policy.   The catchings shipped home and sold cannot, in any sense, be regarded as in the nature of salvage.   After they are shipped, it is expressly agreed that they shall be at the risk of the assured.   They are therefore by agreement withdrawn from the risk covered by the policy.   The elementary definition of salvage, as applied to the contract of insurance, is, that it is a part or remnant of the subject insured,

which survives a total loss.   The catchings sold or shipped
home, being at the risk of the owners, are no longer part of the
subject insured, but are severed from the voyage; and cannot
therefore, in case of a subsequent loss of the vessel from which
they were taken, be deemed salvage under the policy.

<em>Judgment for the defendant.</em>

The *second* case was an action of contract upon a premium
note given on the 30th of July 1850, in consideration of receiving
a similar policy for $11,000 upon the ship William Thompson
and whaling outfits, valued at $16,000 and $28,000 respectively,
at and from New Bedford, at a premium of " six per cent. if the
risk ends within two years, and *pro rata* for a longer time." The
note was for $661, " with such additional sum as may fall due
by the terms of this policy in sixty days after the termination of
the risk."

The ship sailed on the voyage on the 29th of July 1850, and
in October 1851 arrived at Honolulu, where about two thirds
of her oil catchings were taken out and shipped home by the
master, under the direction of the owners, in another vessel, and
arrived at New Bedford in April 1852, where the catchings so
shipped were sold.   No notice of this shipment was given to
the plaintiffs until after the arrival of the ship; but such a notice
was given before the premium note became due.   The ship ar-
rived safely from said voyage on the 5th of March 1853.

" It is agreed, if the fact be material, that it is customary for
the masters to procure supplies and outfits during the voyage,
when necessary, and to pay for them with the proceeds of
catchings sold, or money procured by drafts on the owners,
which supplies and outfits are deemed to be covered by the
original policy—said policy being a valued policy, and covering
any outfits, to the amount of the valuation; and in case catch-
ings have been taken out and sent home, and a total loss after-
wards happens, the insurers do not pay for the one fourth
substituted outfits, so sent home, but claim to deduct them from
the amount of outfits to be paid for, as so much safe to the
owners."

The parties submitted to the decision of the court, upon the above facts, the question whether a *pro rata* premium was " due on the one fourth of the catchings sent home, substituted outfits." And the case was argued at October term 1855.

*T. D. Eliot,* for the plaintiffs.

*O. Prescott,* for the defendants.

BY THE COURT. The construction given to the provisions of the policy in the preceding case of *Mutual Marine Ins. Co.* v. *Munro* is decisive of this case. The policy being a valued one, and the valuation not having been diminished during the voyage by a withdrawal of any part of the subject insured, but one fourth of the whole catchings having been at risk until its close, the *pro rata* premium on the whole sum is due.

*Judgment for the plaintiffs.*